JOHN T. AMEY ET AL *vs.* AUGUSTA LUMBER COMPANY.

Kennebec.      Opinion January 31, 1930.

*Locke, Perkins & Williamson,*
*Thomas Leigh,* for plaintiffs.
*Andrew, Nelson & Gardiner,*
*Burleigh Martin,* for defendant.

SITTING: DEASY, C. J., DUNN, STURGIS, BARNES, PATTANGALL, FARRINGTON, JJ.

DEASY, J.   Action of trover to recover damages for alleged conversion of certain cedar lumber bought by the defendant of Byron Boyd and claimed to be owned by the plaintiffs.

On the 10th day of July, 1924, the plaintiffs gave to Byron Boyd

a written permit authorizing him to "enter upon the Tomhegan and Brassua Water Shed of the Kennebec slope in Township 2, Range 3, N. B. K. P., Somerset County, Maine, commonly known as Soldiertown, and to cut and remove any or all of the cedar, whether said cedar shall be green or dry, standing or down." (Subject to an exception not affecting this case.) Quoting further from permit, "said cutting and removal may continue until April 1, 1933, but not thereafter. Any cedar remaining on said territory after the last named date shall revert to the grantors." The only stipulations contained in the permit material in this controversy are the following. The numbering of the following excerpts is for convenience in reference and is not found in the permit.

(1) "In further consideration for the cutting herein permitted the grantee agrees to pay the grantors as follows: $4000 July 15, 1924, $4000 on January 15, 1925, and $4000 on the 15th of each July and January until $32,000 and interest shall have been paid. To each payment after the first interest at 5%, payable annually from July 15, 1924, shall be added."

(2) "Said grantee hereby agrees that said grantors shall reserve and retain full and complete ownership and control of all timber, both cut and uncut under this permit wherever and however it may be situated until all payments due shall have been made in full. And said grantee further agrees that in case of default in payment for more than thirty days the grantors shall have full power and authority to take all or any part of said cedar that may have been cut wherever and however situated, and to sell and dispose of the same either at public or private sale for cash and after deducting legal expenses shall apply the balance on the debit account of said grantee."

(3) "In consideration of the premises it is further stipulated and agreed that in case the amount of cedar cut in any one year shall exceed the stumpage value of $8000 at six dollars per thousand feet the grantee herein shall pay according to dates of payment herein stated an additional amount necessary to make up six dollars per thousand feet."

Boyd paid at the date specified, or subject to a delay which was

waived, the first four payments of four thousand dollars each. He caused a considerable quantity of cedar to be cut and manufactured the principal portion of it into railroad ties which were sold to the Maine Central Railroad Company.

The butts and tops, called "rift," were sold to and claimed to have been converted by the defendant.

## MEANING OF WORD "DUE"

One point made and stressed by the defendant relates to the meaning of the word "due" in the phrase "until all payments due shall have been made," etc., contained in excerpt 2 above.

The defendant argues that the word "due" means immediately payable. If so, no ownership of or in the lumber sold the defendant is "reserved and retained," inasmuch as the first four payments with interest were made substantially at the dates specified, and inasmuch as the cedar, which is the subject of this suit, was cut before the last of such dates.

But while the word "due" is sometimes used in this sense, and "Courts even have used the word 'due' as synonymous with 'payable'" (*Hawes* v. *Smith*, 12 Me., 433), the word is more commonly used as a synonym of owed or owing. "A note may be due and not payable." (*Greenough* v. *Walker*, 5 Mass., 216.)

The truth is that "the word 'due' has a variety of meanings depending upon the connection in which it is used" (10 A. & E. Ency., page 277), and that "It is sometimes used to express the mere state of indebtment and sometimes to express the fact that the debt has become payable." (*U. S.* v. *Bank*, 6 Pet., 29.)

The word "due" is "defined variously." (12 Cyc., 819.) Its meaning in any contract is to be determined by the context. A careful study of the context in this case shows that the word is not here entitled to the meaning which the defendant's counsel attributes to it. In case of a default occurring after the first payment, the defendant's construction would result in the restoration or revival of the plaintiffs' ownership and control but would deprive of all legitimate meaning the words "reserve and retain," which were the words used by the parties.

## SALE IN ORDINARY COURSE OF BUSINESS

The defendant contends further that at or before the signing of the permit it was agreed that Boyd should have the right to sell cedar in the ordinary course of business. But evidence tending to show this is inadmissible. The permit is a formal document, apparently intended to include the final result of negotiations, and is not to be modified by any prior or contemporaneous oral agreement. The doctrine of independent collateral parol agreements applied in *Neal* v. *Flint*, 88 Me., 72, clearly has no application in this case. The doctrine as there enunciated is not to be extended. (*Burnham* v. *Austin*, 105 Me., 196.)

Moreover, the practical construction placed upon the contract by the parties negatives any such agreement. Boyd did sell railroad ties which were the principal product of his operation, but whenever he sold them he applied for and received releases applying definitely to certain ties. Nothing in the evidence shows or suggests any agreement or understanding that any part of the product could be sold in the ordinary course of business without such release by the plaintiffs.

The defendant quotes from and relies confidently upon the case of *Wentworth* v. *Sargent*, 82 N. H., 111, 129, Atl., 878. This New Hampshire case involves a timber permit given to a man named Nichols. The reservation of ownership is expressed in language very much like that used in the permit given to Boyd. Nichols gave notes for the stumpage.

The permit provided that Nichols "should apply as payment on the notes the sum of not less than five dollars per cord for all the pulp wood cut on the premises and five dollars per thousand feet for all lumber cut." It was held that it should be implied from the language next above quoted that Nichols had the right to sell the lumber in the ordinary course, applying to the note the proceeds or not less than the above amounts per unit.

No language like that quoted is found in the permit given to Boyd. It is unnecessary to determine whether this Court would, if called upon, construe the above quoted language as did the New Hampshire Court.

## ADVANCE PAYMENTS

But the defendant further argues that by the true construction of the permit, each payment of four thousand dollars was to be an advance payment for a certain amount of stumpage at six dollars per thousand, to be cut during the six months next following the payment. If such were the true construction of the contract, a complete defense would be made out, notwithstanding a literal, though hardly reasonable, construction of the permit, would still leave in the plaintiffs, for purposes of securing the performance of the entire contract, the ownership and control of lumber upon which the stumpage had been paid. But the defendant's theory of advance payments above summarized is at variance with the language of the permit and with its apparent meaning, and can not be adopted.

## RECEIPTS FOR STUMPAGE PAID

The defendant defends further upon the ground that the plaintiffs gave to Boyd receipts which had the effect of releasing its claim to the cedar in question.

From time to time during the operation, upon payments made, the plaintiffs gave to Boyd receipts acknowledging payment for stumpage on railroad ties at twenty cents each. Altogether receipts were given for sixty-six thousand ties at twenty cents each, amounting to $13,200. The first of these receipts is dated September 1, 1924, for "stumpage on twenty thousand cedar railroad ties in Soldiertown at twenty cents," amounting to $4,000. The later receipts are similar in form, the total being stated above.

The production of these ties was the main object of Boyd's operation, the lumber sold the defendant being the butts and tops of the trees from which the ties were made. These receipts undoubtedly had the effect of releasing all the right and title to the ties which the plaintiffs in their permit "reserved and retained."

It is urged that the rift (butts and tops) was a mere by-product of the railroad tie operation, and that twenty cents per tie covered the stumpage of the principal product and also of the by-product. It is testified, and not denied, that fifteen cents per tie was equivalent to the basic stumpage price of six dollars per thousand, so that one-fourth of the amount paid and receipted for was for

stumpage of butts and tops, and that all title to such by-product was intended to be, and was released. The receipts, however, purport to cover railroad ties only, and there is no evidence that the plaintiffs intended to acknowledge stumpage payment on anything else.

## PLAINTIFFS' TITLE

Again the defendant contends that the plaintiffs have failed to prove title to the lumber for the conversion of which they sue. The plaintiffs undertook to prove their title by introducing a warranty deed from the Essex Realty Company to the North American Spruce Company and a quit-claim deed from the latter corporation to the plaintiffs. Both deeds include all the land covered by the permit to Boyd, and would be sufficient *prima facie* to prove the plaintiffs' title, but for the fact that in the deed from the Essex Realty Company to the North American Spruce Lumber Company, lot No. 98 containing about two hundred acres is excepted from the warranty. As to lot No. 98, therefore, the plaintiffs produce only quit-claim deeds which do not make out even a *prima facie* title.

It is true that in an action of trover the plaintiff is not bound to prove title. It is sufficient for him to prove possession, or the right of immediate possession. In this case, however, the plaintiffs undertook to prove possession or right of immediate possession, only by showing title. Title, if proved, would be sufficient inasmuch as one having title is constructively in possession in the absence of testimony showing the contrary. The plaintiffs having failed to show title to lot 98, have failed to prove possession of that part of the cedar which came from said lot 98. Lot 98 is a very small part of the land described in the permit, which is stated to contain about twenty thousand acres. The cedar operation, however, covered only about twelve hundred acres, and lot 98, containing about two hundred acres of "good cedar territory," is a substantial part of the land available for the cedar operation. It is shown that the American Realty Company claimed title to lot 98 and took possession of it. Boyd obtained from that corporation permission to cut cedar upon said lot. The plaintiffs had notice of this, and on July 22, 1926, wrote to Boyd: "Whatever stumpage you pay, and whatever you have to pay in the future for cedar on this lot (No. 98) should be deducted from the sale price to you. We should how-

ever be consulted in the settlement of the stumpage because we have title to this lot, and we expect to contest in the courts with the American Realty Company."

It appears that a considerable quantity of cedar rift which was reserved and retained by the plaintiffs in their permit, the stumpage on which had not been released by them, was sold and delivered by Boyd to the defendant. A person who purchases, takes delivery of and holds chattels from one who has no legal right to sell them, is guilty of conversion. *Freeman* v. *Underwood*, 66 Me., 229; *Gilmore* v. *Newton*, 9 Allen, 171; *Cooper* v. *Newman*, 45 N. H., 339.

The measure of damages in an action of trover brought by the absolute owner or brought against a stranger to the title is the fair market value of the chattels converted at the time and place of conversion.

There is some evidence that the quantity of cedar purchased and received by the defendant coming from Boyd's operation in Soldiertown was 349,060 feet. There is also evidence that at the place where delivery was received the fair market value of the cedar was eighteen dollars per thousand.

Thus the damage claimed to be recovered by the plaintiffs is $6,283.08, plus some interest. But the above measure of damages does not apply when the ownership of the plaintiffs is qualified and the suit is against a party having an interest in the chattels or against a party in privity with him. "plaintiff who had only a special property or qualified interest in goods which have been converted, can recover only the value of such property or interest, not exceeding however, the value of the goods, against a defendant who had title to or was entitled to the remaining interest." (38 Cyc., 2,089.) "If the plaintiff having but a limited title brings his action against one having the remaining interest, or against one claiming under such residuary owner, he can then recover only according to his interest." (*Lumber Company* v. *Mfg. Company*, 104 Me., 206.) "If the property is converted by the owner of an interest therein, or by one acting in privity with him, the plaintiff can recover only to the extent of the value of his own interest in the property." (26 R. C. L., 1153.)

The plaintiffs' was plainly a qualified title.

By the language of the permit, they reserved and retained full

and complete ownership. But such reservation was clearly only for the purpose of security. The plaintiffs reserve title for the purpose of securing a performance of the contract by Boyd. The residuum of the title was in Boyd.

If the contract had been in full force at the time of the conversion, the balance then due on the contract was sixteen thousand dollars. In such case, the damage would have been not sixteen thousand dollars, but the market value of the cedar, because recovery can not exceed the fair market value of the chattels. (38 Cyc., 2089.)

### RESCISSION OF CONTRACT

But the defendant says that the contract had been renounced and rescinded, and was not in force at the time of the conversion.

In 1926, after Boyd had, with the plaintiffs' consent, attorned to the American Realty Company, and paid that company stumpage upon a substantial part of the land covered by his permit from the plaintiffs, he notified the plaintiffs that the contract had been violated on their part, and that he was through operating upon it.

Whether or not the title of the American Realty Company to lot No. 98 was, or was not, superior to the title of the plaintiffs (a point which upon the evidence now before the court can not be determined), Mr. Boyd apparently had a right to treat the contract as at an end. By the original contract, the plaintiffs, in effect, guaranteed that they were the owners of the property specified in the permit, and authorized Boyd, in consideration of thirty-two thousand dollars, to be paid to them by him, to cut and carry away cedar from all parts of it. After the American Realty Company had taken possession of lot 98, the plaintiffs seem to have tried to amend their contract by substituting an agreement that if Boyd would buy stumpage of the American Realty Company upon lot 98, they, the plaintiffs, would reimburse him for any sum paid that company. Boyd might have assented to this modification, but he declined to do so, and treated the contract as at an end, and so notified the plaintiffs.

The rights under the permit being terminated, the value of the plaintiffs' qualified title must be estimated at the basic price of six dollars per thousand, or $2,094.86.

This, however, includes the cedar cut upon lot 98, and to this lot and the cedar taken from it, the plaintiffs have proved no title or right of possession. The stumpage value of this cedar may for purposes of this case fairly be estimated as the amount which Boyd paid the American Realty Company for stumpage, which was $250. Deducting this amount, the value of the plaintiffs' interest in the cedar in which they have proved even qualified title is $1,844.36.

In an action of tort to recover unliquidated damages, interest is not recoverable as a matter of right, but a jury, or a court exercising jury powers, may include a sum as interest or equivalent to interest as a part of the damages. (*Water Power Company* v. *Lewiston*, 101 Me., 564; 17 C. J., 820.)

No reason is perceived for adding interest in this case.

Judgment for plaintiffs for $1,844.36.